**No. 24-14236-JJ**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**
***Plaintiff/Appellee*,**

**v.**

**JUSTIN SIGMON,**
***Defendant/Appellant*.**

---

**On Appeal from the United States District Court**
**for the Southern District of Florida**

---

# INITIAL BRIEF OF APPELLANT JUSTIN SIGMON

---

**HECTOR A. DOPICO**
**Federal Public Defender**
**ANSHU BUDHRANI**
**Assistant Federal Public Defender**
**Attorneys for Appellant**
**150 West Flagler Street, Suite 1700**
**Miami, Florida 33130**
**Telephone No. (305) 530-7000**

**THIS CASE IS ENTITLED TO PREFERENCE**
**(CRIMINAL CASE)**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

**United States of America v. Justin Sigmon**
**Case No. 24-14236-JJ**

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Astigarraga, Lauren Alexandra

Bharathi, Sowmya

Budhrani, Anshu

Calderon, Marx

Caruso, Michael

Dopico, Hector A.

Fernandez, Bertila

Flores, Hector L.

Goodman, Hon. Jonathan

Graham, Hon. Donald L.

Jayanthi, Srilekha

Lapointe, Markenzy

Louis, Hon. Lauren Fleischer

Matzkin, Daniel

Monk, Lacee Elizabeth

Obenauf, Jessica Kahn

O'Byrne, Hayden P.

Reid, Hon. Lisette M.

Reding Quiñones, Jason

Sigmon, Justin Dale

Silverstein, Joan

Stanley, William

United States of America

Williams, Hon. Kathleen M.

*/s/ Anshu Budhrani*
Anshu Budhrani

## STATEMENT REGARDING ORAL ARGUMENT

"I have been doing this a long, long time . . . [a]nd after 33 years . . . this is the most difficult case that I have encountered, both from the law and from the facts." That is how the district court described this case. It raises important questions about (1) whether a prosecution built upon insinuation, conjecture, and speculation fulfills the Constitution's requirement that no conviction may stand unless built upon proof of guilt beyond a reasonable doubt as to each element of the charged offense; and (2) whether a new trial is required where it is irrefutable that the jury was exposed to extraneous information during its deliberations. As such, Mr. Sigmon respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................... C-1

STATEMENT REGARDING ORAL ARGUMENT .................... i

TABLE OF CITATIONS .................... iv

STATEMENT OF JURISDICTION .................... 1

STATEMENT OF THE ISSUES .................... 2

INTRODUCTION .................... 3

STATEMENT OF THE CASE .................... 4

I. Course of Proceedings, Facts, and Disposition Below .................... 4

A. Course of Proceedings and Disposition Below .................... 4

B. Facts .................... 13

II. Standards of Review .................... 16

SUMMARY OF THE ARGUMENT .................... 17

ARGUMENT AND CITATIONS TO AUTHORITY .................... 19

I. Mr. Sigmon's Conviction Must be Reversed Because No Factfinder Could Reasonably Conclude that Mr. Sigmon's Guilt Was Established Beyond a Reasonable Doubt .................... 19

II. The District Court Abused its Discretion When It Denied Mr. Sigmon's Motion for a New Trial Based Upon the Jury's Confirmed Exposure to Extraneous Information; Prejudice Was Presumed, and the Government Failed to Rebut that Presumption by Showing that the Exposure Was Harmless .......... 28

CONCLUSION .......... 40

CERTIFICATE OF COMPLIANCE .......... 41

CERTIFICATE OF SERVICE .......... 42

## TABLE OF CITATIONS

**CASES**

*Alleyne v. United States*,

570 U.S. 99 (2013) .......... 30

*In re Winship*,

397 U.S. 358 (1970) .......... 21

*Jackson v. Virginia*,

443 U.S. 307 (1979) .......... 19, 20, 26

*Patterson v.* Colorado,

205 U.S. 454, 462 (1907) .......... 39

*Remmer v. United States*,

347 U.S. 227 (1954) .......... 30

*Smith v. Phillips*,

455 U.S. 209 (1982) .......... 29

*Sullivan v. Louisiana*,

508 U.S. 275 (1993) .......... 24

*Turner v. Louisiana*,

379 U.S. 466 (1965) .......... 29, 39

*United States v. Dortch*,

696 F.3d 1104 (11th Cir. 2012) ........................................................ 30

*United States v. Goldesberry*,

128 F.4th 1183 n(10th Cir. 2025)........................................... 19, 26, 27

*United States v. Harris*,

989 F.3d 908, 911 (11th Cir. 2021)..................................................... 16

*United States v. Jones*,

44 F.3d 860 (10th Cir. 1995) ............................................................. 24

*United States v. Jones*,

713 F.3d 336 (7th Cir. 2013) ............................................................. 26

*United States v. Louis*,

861 F.3d 1330 (11th Cir. 2017) ................................................... 16, 24

*United States v. Martinez*,

14 F.3d 543 (11th Cir. 1994) ................................................. 16, 31, 38

*United States* v. *Pauling*,

924 F.3d 649 (2d Cir. 2019)................................................................ 26

*United States v. Perkins*,

748 F.2d 1519 (11th Cir. 1984) ............................................. 29, 38, 39

*United States v. Powell*,

469 U.S. 57 (1984) .......................................................................... 19

*United States v. Siegelman*,

640 F.3d 1159 (11th Cir. 2011) ......................................................... 30

*United States v. Villegas*,

911 F.2d 623 (11th Cir. 1990) ........................................................... 27

**STATUTES**

18 U.S.C. § 2244(a)(5)............................................................... 4, 21

18 U.S.C. § 2246(3)......................................................................... 21

18 U.S.C. § 3231 ............................................................................... 1

18 U.S.C. § 3742 ............................................................................... 1

28 U.S.C. § 1291 ............................................................................... 1

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. VI ................................................................ 28-29

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231, because Mr. Sigmon was charged with an offense against the laws of the United States. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which confers jurisdiction on the courts of appeals from final decisions and sentences of the district courts. This appeal was timely filed on December 27, 2024 (DE 139) from the final judgment entered on December 19, 2024 (DE 134), disposing of all claims between the parties to this appeal.

## STATEMENT OF THE ISSUES

I. Whether sufficient evidence was adduced at trial to prove beyond a reasonable doubt that Mr. Sigmon knowingly engaged in sexual contact with his daughter based on three videos taken from different angles showing his hand on her leg for less than five minutes while she was seated in his lap at dinner aboard a cruise ship with her mother and older sister across the table from her.

II. Whether the district court erred in denying Mr. Sigmon a new trial where it is irrefutable that the jury was exposed to extraneous information—unredacted forfeiture allegations in the indictment—and the government failed to rebut the presumption of prejudice to Mr. Sigmon.

## INTRODUCTION

The district court below described this case as "the most difficult case" it had encountered in 33 years. (DE 180:98–99.) That was for good reason. This case exemplifies the dangers of an overzealous prosecution where the great power of the government was wielded irresponsibly. Based upon a less-than-five-minute video excerpt of Mr. Sigmon touching his daughter's leg while she sat on his lap at dinner aboard a cruise, the government asked a jury to infer criminal intent and convict Mr. Sigmon of unlawful sexual contact with a minor. The conduct at issue raised questions that needed answering, and no one suggests that it should have been ignored. But troubling conduct is not the same as criminal conduct, and speculation is not the same as proof beyond a reasonable doubt. The Constitution requires more than an act that "looks bad"; it requires proof that the act was conducted with a guilty state of mind. That proof is completely lacking here.

The government disregarded a forensic interviewer's finding that there were no indicators of sexual abuse, as well as her recommendation that Mr. Sigmon and his family be referred to state child protective services in Virginia. Instead, the government forged ahead with a federal criminal prosecution, constructing a narrative built upon nothing more

than insinuation, conjecture, and pure speculation—for example, by calling into the question the number of photos Mr. Sigmon had of his daughter on his phone, while noting the absence of photos of his wife in a bathing suit. By such logic, any involved father could be branded a predator. The American justice system does not countenance convictions based upon innuendo and speculation. A conviction must be based upon facts that prove each element of the charged offense beyond a reasonable doubt.

The government failed to introduce sufficient evidence here—an error that was then compounded when the jury was exposed to extrinsic evidence that impermissibly filled the gaping holes in the government's case. This Court should step in and grant Mr. Sigmon the relief he was erroneously denied below.

## STATEMENT OF THE CASE

### I. Course of Proceedings, Facts, and Disposition Below

#### A. Course of Proceedings and Disposition Below

In July 2023, a federal grand jury sitting in the Southern District of Florida returned a one-count indictment against Justin Sigmon, charging him with knowingly engaging, and attempting to engage, in sexual contact with a minor, in violation of 18 U.S.C. § 2244(a)(5). (DE

11.) The indictment included a number of forfeiture allegations, including:

> 2. Upon conviction of a violation of Title 18, United States Code, Section 2244, as alleged in this Indictment, the Defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 2253(a):
>
> a. Any visual depiction described in Title 18, United States Code, Sections 2251, 2251A, or 2252, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of Title 18, United States Code, Chapter 110;

(DE 11:2.)

Mr. Sigmon proceeded to trial, which lasted five days. The government's evidence primarily consisted of the testimony of two passengers aboard the cruise ship—Venus Burgess and Veronica Hill—and the cell phone videos they each recorded—as well as surveillance footage from the cruise ship of the dining room where Mr. Sigmon had dinner with his family on May 26, 2023. The government also elicited the testimony of Dr. Jamie Dickson, a psychologist with no knowledge of the case; Rajesh Nalawabe, chief security officer for Carnival Cruise Line; Alberto Silva, a Customs and Border Protection Officer; Jasmine Rivera,

a digital forensic examiner at the FBI; and Daniel Lemaitre, a special agent with the FBI.

At the close of the government's case, Mr. Sigmon moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which the court denied. (DE 101:33–37.) In so denying, the court incorrectly noted the standard of proof to be applied by the court when considering motions for a judgment of acquittal:

> As the parties are aware, the stage that we are in now requires the Court to look at the evidence in the light most favorable to the government. That's the standard from the purview of the defense. And if one looked at the evidence in the light most favorable, which we know that's not the standard for the jury, in fact, quite the opposite, as the jury has to determine probable cause or beyond a reasonable doubt I should say, and that's a big distinction. But for Rule 29 purposes, the Court has, as stated, must look at the evidence and all the inferences therefrom in favor of the government.

(DE 101:36–37.) The court went on to reason: "That being the test, based upon the evidence in this cause, this is a question for the jury to decide; not the Court. And so *with that standard in mind*, the motion is denied. (DE 101:37 (emphasis added).)

Mr. Sigmon testified in his own defense, and also presented the testimony of a number of other witnesses, including Dr. Mark Mills, a forensic psychiatrist who had evaluated Mr. Sigmon; his wife, Rita

Sigmon, who was present at the dinner where the alleged incident occurred; Special Agent Daniel Lemaitre; two colleagues at the sheriff's office, Jeffrey McCarty and Erik Mollin; his pastor, Jonathan Haskew; and an old friend, Jennifer Talley.

Mr. Sigmon also requested that the court admit the conclusion of a report authored by Hope Wilson of the Broward County Child Protection Team, to whom the FBI referred Mr. Sigmon's daughter for a forensic interview on May 29, 2023. The report concluded "there are no indicators of sexual abuse," and recommended that "Child Protective Services in the state of Virginia, complete ongoing investigation and assess for child safety." (DE 102:175–177; DE 73-1.) The court denied Mr. Sigmon's request to introduce the report's conclusion on various grounds, including that it was not an admission against interest, but marked the report for identification and permitted it to be filed as part of the record. (DE 102:175–77, 185.)

At the close of all the evidence, Mr. Sigmon renewed his motion for a judgment of acquittal, which the court denied after adopting its prior ruling. (DE 102:183.) The parties then proceeded to closing arguments. The government stressed that the jury need only consider the three

videos admitted into evidence: "You have the videos. The videos are the crux of this case . . . . [T]he video is the best evidence of what occurred: It is what it is. It speaks for itself." (DE 103:9, 11.) During its rebuttal closing argument, the government insinuated—without any factual support—that Mr. Sigmon did, indeed, possess child pornography; he just knew how not to get caught with it:

> Defense counsel said there was no child pornography on his phone. The phone that he used for his personal use was a work phone. This man is No. 2 in the sheriff's office. He's not going to have child pornography on his phone. He also said he deleted items on the cruise after cruise ship security confronted him. We don't know what that is; and, unfortunately, we can't recover all deleted information. We'll never know. But if he had no child pornography on his phone ever, it wouldn't be a surprise; right? Because he's trying to make sure that he's not discovered.

(DE 103:41.)

The court instructed the jury, and they were then released to begin their deliberations on November 17, 2023. The jury returned a verdict of guilty on the sole count of the indictment. (DE 68.)

Shortly thereafter, the court was notified that the "Redacted Indictment" listed on the docket as the version submitted to the jury during its deliberations—DE 70—was not, in fact, redacted, and included the unredacted forfeiture allegations. (DE 124:7.) On November 30,

2023, the court held a status conference to discuss this issue with the parties. (DE 85:8–10.) The court advised the parties that the Clerk's Office "advised that the indictment that may have gone back to the deliberation room did not have the forfeiture count removed." (DE 85:9.) Specifically, the court shared that the Clerk's Office informed that "when they uploaded [the indictment] into the docket, someone noticed the forfeiture count was there, and that's why they contacted [the court]." (DE 85:10.) Having shared this information, the court solicited the parties' positions on "[w]hat, if anything, emanates, is prejudicial by the jury reading the forfeiture count," and requested post-trial motions on the matter. (DE 85:10.) The court also appointed the Office of the Federal Public Defender to file an amicus brief on the same. (DE 84.) The court was concerned that the unredacted forfeiture allegations could have given the jury the incorrect impression that Mr. Sigmon possessed child pornography. (DE 85:8–10.)

The Office of the Federal Public Defender filed its Amicus Brief on February 5, 2024. (DE 104.) On that same day, Mr. Sigmon filed a renewed motion for judgment of acquittal as well as a motion for a new trial, pursuant to Fed. R. Crim. P. 29 and 33. (DE 105.) The government

filed an omnibus response in opposition (DE 108), to which the Office of the Federal Public Defender and Mr. Sigmon filed their replies (DE 109; DE 110). The court then held oral argument on the pending motions, wherein the government argued that "the record is [un]clear as to whether an indictment went back to the jury, one, and also if one did whether or not the jurors saw it." (DE 154:4.)

To address the government's concerns, the court held an evidentiary hearing on August 30, 2024, wherein the court colloquied the jurors on if they received and read the two-page indictment. Eleven of the twelve jurors appeared, and the court asked each juror the same question: "During the jury deliberations, do you recall reading or having read to you the entirety of the allegations in the indictment, that being pages one through two?" (DE 156:8.) The court did not ask any follow-up questions. Per the court's calculations, seven of the jurors responded "yes" they read the entirety of the indictment; one juror recalled reading a portion of the indictment; and the remaining three jurors answered "no" they did not read the entire indictment. (DE 124:10–11; DE 156:11–24.)

The court then entered its order denying both the renewed motion for a judgment of acquittal as well as the motion for a new trial based

upon the jury's undisputed exposure to and consideration of unredacted forfeiture allegations in the indictment. (DE 124.) With regard to the judgment of acquittal, the court first found that Mr. Sigmon touched his daughter "under her dress on her legs, including between her thighs, while she sat on his lap." (DE 124:24.) The court then found the evidence sufficient as to intent because there was no "non-sexual explanation for [Mr.] Sigmon's touching of [his daughter] under her dress on her inner thigh," and because, by pushing his hand away, Mr. Sigmon's daughter was harassed. (DE 124:26.) The court determined that there was sufficient evidence for the jury to find beyond a reasonable doubt that Mr. Sigmon's "touching of [his daughter's] inner thigh was done, at the very least, with the intent to harass." (DE 124:29.)

With regard to the motion for a new trial, while the court found that Mr. Sigmon "met his burden of making a colorable showing that the exposure has, in fact, occurred," the court found no prejudice to Mr. Sigmon from the jury's exposure to the forfeiture allegations. (DE 124:17, 21–22.)

The court then set the case for sentencing. Prior to the hearing, Probation prepared a Presentence Investigation Report ("PSI"),

calculating Mr. Sigmon's total offense level to be 24 with a criminal history category I, making his advisory Guidelines range 51 to 63 months imprisonment. (PSI ¶ 68.)

Mr. Sigmon submitted over 90 letters from family, friends, and his community, as well as the testimony at the sentencing hearing of his sister, his wife, and his older daughter. His older daughter noted, in an emotional statement, her dismay that "[n]o person from the prosecution ever interviewed [her or her sister]." (DE 180:67.) Before pronouncing its sentence, the court first noted: "I have been doing this a long, long time . . . [a]nd, after 33 years . . . this is the most difficult case that I have encountered, both from the law and from the facts." (DE 180:98–99.) The court then observed that "the circumstances of this case are very, very unique" because "[u]sually, it is really easy to determine one of the methods by which the crime can be committed," whereas here, the court was "not sure which of the modes the jury determined." (DE 180:101.) The court then sentenced Mr. Sigmon to a term of imprisonment of 24 months followed by ten years of supervised release. (DE 180:105–06.) The court imposed a number of special conditions of supervised release on Mr. Sigmon—including a prohibition against any unsupervised

contact with his children—which the court subsequently removed after Mr. Sigmon participated in treatment with a therapist. (DE 195.) He is now free to return to his home and parent his children unsupervised.

Mr. Sigmon timely filed a notice of appeal in his case (DE 139.) He is currently on supervised release.

**B. Facts**

To celebrate his 25th wedding anniversary, Justin Sigmon decided to take his family—his wife, Rita, and his two daughters, ages 16 and 9—on a Carnival Cruise to the Bahamas. (DE 102:9, 43.) On May 26, he and his family went to dinner at one of the ship's restaurants. It was a "formal night," so the family dressed for dinner. (DE 102:53.) They were seated at a table, with Mr. Sigmon sitting next to his younger daughter and across the table from Rita and his older daughter. The family waited a relatively long time to get their food—they had been seated for about an hour when it arrived—and spent a total of approximately one hour and twenty minutes at dinner. (DE 102:54.)

After having been seated for about 23 minutes, Mr. Sigmon's younger daughter decided to sit on his lap. (Gov't Ex. 2A at 23:00.) He made room for her, and continued the conversation he was having with

Rita, while his younger daughter played on her cellphone. A few minutes later, Mr. Sigmon rubbed his daughter's leg while she was still seated on his lap. She brushed his hand away a few times. After less than five minutes, she got off his lap and returned to her own chair. (Gov't Ex. 2A at 27:10–32:00.)

Venus Burgess and Veronica Hill were seated at the table next to Mr. Sigmon and his family and noticed him rubbing his daughter's leg under her dress as well as her pushing his hand away. (DE 100:74, 89.) Concerned, they took cellphone videos of the family and provided their videos to cruise ship security. (DE 100:77–78, 91; Gov't Ex. 1A; Gov't Ex. 1B.) After they left the restaurant, Mr. Sigmon's daughter once again climbed into his lap. (Gov't Ex. 2A at 57:30.) She was busy on her phone, taking selfies with Mr. Sigmon. She jumped off his lap after less than two minutes, and continued playing on her phone, dancing around, and annoying her older sister. (Gov't Ex. 2A at 59:00.)

Mr. Sigmon was questioned by cruise ship security that night, but after speaking with him, they allowed him to carry on with his family vacation. (DE 100:97–98.) Once the ship docked in Miami, Mr. Sigmon was escorted off by Customs and Border Protection ("CBP"). (DE

100:118.) CBP Officer Alberto Silva searched Mr. Sigmon's phone and noted that he had over 10,000 photos on the phone. (DE 100:121.) Officer Silva was looking for contraband—such as images of child pornography—but found none. (DE 100:123.)

Mr. Sigmon was then interrogated be Special Agent Lemaitre of the FBI. Mr. Sigmon acknowledged mindlessly rubbing his daughter's leg. (DE 101:70.) He admitted, after watching the videos, that "it didn't look right . . . but that it wasn't sexual." (DE 101:12, 73.) Mr. Sigmon also insisted that there was "zero percent chance that [he] was aroused." (DE 101:13.)

He cooperated fully with Special Agent Lemaitre, including giving the FBI permission to search his cell phone. (DE 101:13.) Special Agent Lemaitre confirmed that there was "no child sex abuse material" on Mr. Sigmon's phone. (DE 101:14.) But, he did opine, incorrectly, that the phone contained a lot of photos of Mr. Sigmon's daughter, and no photos of Rita in a bathing suit. (DE 101:14.) Special Agent Lemaitre also noted, incorrectly, that, in his view, there were no signs of affection in the text messages between Mr. Sigmon and Rita—"[t]hey were mostly logistical" messages about "chores, who is doing what, who's on first." (DE 101:15–

16.) He failed to mention on direct examination that Mr. Sigmon and his wife meet for lunch several times per week, which, he admitted on cross examination, is a show of affection. (DE 101:29.)

## II. Standards of Review

This Court "review[s] *de novo* a district court's denial of a motion for acquittal." *United States v. Louis*, 861 F.3d 1330, 1333 (11th Cir. 2017).

This Court reviews a district court's denial of a motion for a new trial based on the jury's exposure to extrinsic evidence for an abuse of discretion. *United States v. Martinez*, 14 F.3d 543, 547 (11th Cir. 1994). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *United States v. Harris*, 989 F.3d 908 (11th Cir. 2021) (quotation marks omitted). A district court also abuses its discretion "when it commits a clear error of judgment." *Id.* at 912.

## SUMMARY OF THE ARGUMENT

Mr. Sigmon's conviction must be reversed for two reasons. First, the evidence was insufficient to establish the elements of the charged offense beyond a reasonable doubt. Second, the jury's exposure to extrinsic information in the form of unredacted forfeiture allegations prejudiced Mr. Sigmon, mandating a new trial.

On the sufficiency issue, the government's case rested almost entirely on less than five minutes of a video of Mr. Sigmon rubbing his daughter's leg while she sat on his lap at dinner in a restaurant aboard the cruise ship. Mr. Sigmon's wife, Rita, and older daughter were seated across the table from him. While the video may raise concerns, it does not provide proof beyond a reasonable doubt that Mr. Sigmon acted with the specific intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of himself or another person. The American criminal justice system requires proof of intent, not mere speculation or suspicion. Where the evidence is equally consistent with innocence and guilt, it is insufficient as a matter of law. Because the government's evidence was insufficient, the Court must reverse Mr. Sigmon's conviction and remand for entry of a judgment of acquittal.

Reversal is also required because the jury was unquestionably exposed to extrinsic information in the form of unredacted forfeiture allegations in the indictment. These allegations commanded that the defendant "shall forfeit" all visual depictions that violate the law. The jury could only have understood these allegations to be referring to child pornography or to some other criminal act committed by Mr. Sigmon. Such exposure is presumptively prejudicial, and the government bears the heavy burden of rebutting the presumption of prejudice by showing that any exposure was harmless. The government failed to meet that burden, and the district court abused its discretion in denying Mr. Sigmon a new trial. As such, this Court should, alternatively, reverse and remand for a new trial.

## ARGUMENT AND CITATIONS TO AUTHORITY

### I. MR. SIGMON'S CONVICTION MUST BE REVERSED BECAUSE NO FACTFINDER COULD REASONABLY CONCLUDE THAT MR. SIGMON'S GUILT WAS ESTABLISHED BEYOND A REASONABLE DOUBT

The right to a trial where guilt is established as to each element of the indicted offense beyond a reasonable doubt "requires more than simply a trial ritual." *Jackson v. Virginia*, 443 U.S. 307, 316–17 (1979). Rather, the government must both "convince the jury with its proof" and "satisfy the courts that given this proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt." *United States v. Powell*, 469 U.S. 57, 67 (1984). That is, "proper deference to the jury's verdict does not mean abdication of the judicial role." *United States v. Goldesberry*, 128 F.4th 1183, 1192 (10th Cir. 2025). Even "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 317–18.[1]

---

[1] The district court here functionally abdicated its role as gatekeeper of Mr. Sigmon's constitutional right to have his guilt as to each element established beyond a reasonable doubt. In ruling on Mr. Sigmon's motion for a judgment of acquittal at the close of the government's case, the court applied the incorrect standard, believing that, while a jury must determine whether the evidence adduced is

Consequently, courts must be vigilant in enforcing "[t]he constitutional standard . . . that protects an accused against a conviction" except "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Jackson*, 443 U.S. at 315. The Supreme Court has long acknowledged that "the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Id.* at 317 n.10. A jury is never empowered to "enter an unreasonable verdict of guilty," and when it does, courts must "impinge[] upon" the jury's discretion "to guarantee the fundamental protection of due process of law," and thus, safeguard a defendant's right to proof beyond a reasonable doubt. *Id.* at 317 n.10, 319. Such judicial intervention is required here because no factfinder could reasonably

---

sufficient to prove guilt beyond a reasonable doubt, the standard the court applies is much lower. (*See* DE 101:36–37 (noting that while the jury must "determine [guilt] . . . beyond a reasonable doubt," for Rule 29 purposes, the court's standard is "quite the opposite" and must instead "look at the evidence and all the inferences therefrom in favor of the government," and ruling that "[t]hat being the test . . . [a]nd with that standard in mind," the motion was denied).) Had the court applied the proper burden of proof to determine whether a reasonable juror could find proof beyond a reasonable doubt as to each element of the charged offense, this case would not have reached the jury.

conclude that Mr. Sigmon's guilt was established "with utmost certainty." *In re Winship*, 397 U.S. 358, 364 (1970).

To sustain a conviction for sexual contact with a child under the age of 12, in violation of 18 U.S.C. § 2244(a)(5), the government must prove beyond a reasonable doubt, in relevant part, that the defendant knowingly engaged, or attempted to engage, in sexual contact with the minor victim. Sexual contact, in turn, requires an "intentional touching . . . of the genitalia, anus, groin, breast, inner thigh, or buttocks" with an "intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3). The statute thus requires both an actus reus—a touching—as well as a specific mens rea—that such touching was knowing and intentional, and done with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

Here, the government's evidence—even when viewed in the light most favorable to the government and drawing every reasonable inference in the government's favor—is insufficient to prove beyond a reasonable doubt that the touching was done with an intent to abuse, humiliate, harass, degrade, or arouse or gratify Mr. Sigmon's sexual

desire, or that of anyone else. Its evidence as to intent is *pure* speculation, which even the district court acknowledged: "Let's, please, try to get some facts out and not speculating and possibly and maybe." (DE 100:145.)

As the government acknowledged throughout trial, the video of the alleged incident—in the form of a cellphone video as well as cruise ship surveillance video showing from different angles the table at which Mr. Sigmon and his family were seated for dinner—is the "best evidence of what actually occurred that night" and "speaks for itself." (DE 102:145.) The videos "are the crux of the case," and, as the government noted in its closing argument, it does not matter what anyone else had to say about what happened that night, including the government. (DE 103:9, 11.) The video "is what it is" and "speaks for itself." (DE 103:11.) Yet, the government had to speak for the video in attempting to prove that Mr. Sigmon acted with the intent to abuse, humiliate, harass, degrade, or arouse or gratify his sexual desire, because there was no actual evidence adduced as to that element.

In its closing, the government attempted to narrate the video from Mr. Sigmon's daughter's perspective: "she shoots him a look: Don't do

that. I don't want to be touched there. . . . She doesn't want him to touch her there." (DE 103:13, 17.) But the government's interpretation of what is happening in the video is not evidence. It is purely speculative argument. In fact, the government, through the FBI, had Mr. Sigmon's daughter evaluated in a forensic interview conducted by Broward County's Child Protective Team. (*See* DE 73-1.) But the forensic interview did not fit the government's narrative—the interviewer found no indicators of sexual abuse—so it was not introduced. (DE 73-1:5.)

Instead, the government resorted to insinuation and rank speculation—on behalf of Mr. Sigmon's daughter, his wife, and Mr. Sigmon himself—to paint a picture of a man and a family that *did* fit the government's narrative. The government argued: the daughter didn't want to be touched—she is "a conflicted little girl forced to live a double life" (DE 103:47); the wife "had a sense of resentment in her voice" when she talked about her nine-year-old daughter (DE 103:46), which suggested she was jealous of her own child's relationship with her father; Mr. Sigmon and his wife are in an affectionless marriage; Mr. Sigmon has too many photos of his daughter and not enough photos of his wife in a bathing suit on his phone; Mr. Sigmon did not have any child

pornography on his phone because he is the "No. 2 in the sheriff's office. He's not going to have child pornography on his phone . . . . [H]e's trying to make sure that he's not discovered" (DE 103:41). These are not facts, nor are they reasonable inferences drawn from facts. It certainly is not evidence beyond a reasonable doubt; it is pure storytelling.

The government introduced zero evidence from which the jury could reasonably infer that Mr. Sigmon acted with the intent to abuse, humiliate, harass, degrade, or arouse or gratify his sexual desire. An inference is unreasonable if it requires the jury "to engage in a degree of speculation and conjecture that renders its findings a guess or mere possibility," *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995), because "[i]t would not satisfy the [Constitution] to have a jury determine that the defendant is *probably* guilty." *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (emphasis in original). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt." *Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir. 1982).

Mr. Sigmon admits that he touched his daughter's leg; he does not dispute the act occurred. But he vehemently opposes any insinuation that he did so with the specific intent to abuse, humiliate, harass, degrade, or arouse or gratify his sexual desire. And there is no evidence in this record—even circumstantial—to suggest otherwise. His daughter climbed into his lap at the dinner table in a crowded restaurant on the cruise ship for less than five minutes. She then returned to her seat and behaved as any precocious nine-year-old on vacation might—she danced around, took selfies, and annoyed her older sister. She then climbed back into her father's lap later during that same dinner—which is also captured on the ship's surveillance video—and cajoled her father to take a selfie with her as she grabbed his face and gave him a kiss on the cheek. (Gov't Ex. 2A at 57:27–57:43.) She then jumps off his lap less than two minutes later, right as dinner is served. The government's entire case is premised upon those five minutes she spent sitting on his lap for the first time, completely devoid of context. There is nothing else. That act cannot, on its own, support an inference beyond a reasonable doubt that Mr. Sigmon acted with the specific intent of abusing, humiliating, harassing, or degrading her, or arousing or gratifying his sexual desire.

The inferences the government asked the jury to draw from the videos were impermissibly speculative; "a strong suspicion that someone is involved in a criminal activity is no substitute of guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 347 (7th Cir. 2013); *see also United States* v. *Pauling*, 924 F.3d 649, 656–67 (2d Cir. 2019) (noting the distinction between reasonable speculation and sufficient evidence, and explaining that though some speculation "may indeed be reasonable," it is still insufficient because though a finder of fact may "conclude[] that a disputed fact exists within the realm of possibility," that conclusion "is nevertheless unreasonable because it is not logically based on another known fact to exist"). The government asks too much of the videos here—they cannot support a reasonable finding of guilt because they cannot satisfy the "state of near certitude" required by *Jackson*. 443 U.S. at 315.

"The evidence of what happened . . . supports *actus reus*, not *mens rea*," and "the government cannot prove *mens rea* simply by repeatedly proving *actus reus*." *Goldesberry*, 128 F.4th at 1198, 1200. Per the government, a finding that Mr. Sigmon touched his daughter's inner thigh is enough; that means the "the government has met its burden."

(DE 103:18.) But that is not nearly sufficient. As a result, because the government's evidence as to intent is nonexistent, and, at best, draws only a "speculation of guilt," *United States v. Villegas*, 911 F.2d 623, 628 (11th Cir. 1990), Mr. Sigmon's conviction cannot stand. *See Goldesberry*, 128 F.4th at 1203 (vacating conviction for insufficient evidence where father was accused of intentionally touching minor daughter's vagina because the government failed to introduce any evidence as to *mens rea*; holding that, "*at best*, the evidence on *mens rea* is in equipoise," which means the government failed to carry its heavy burden) (emphasis in original).

* * *

In our constitutional system, this Court plays a critical role in ensuring that people are not sent to prison except when their guilt has unquestionably been established to utmost certainty. In this case, even when the evidence is considered in the light most favorable to the government, it fails to show beyond a reasonable doubt that Mr. Sigmon acted with specific intent to abuse, humiliate, harass, degrade, or arouse or gratify his sexual desire. The videos alone, which simply show the actus reus of the incident, are not enough to allow a factfinder to

reasonably conclude that the prosecution proved Mr. Sigmon's guilt beyond a reasonable doubt as to all elements of the offense. Under binding precedents of the Supreme Court and this Court, and persuasive precedents of sister circuits, this Court must intervene and reverse Mr. Sigmon's conviction.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED MR. SIGMON'S MOTION FOR A NEW TRIAL BASED UPON THE JURY'S CONFIRMED EXPOSURE TO EXTRANEOUS INFORMATION; PREJUDICE WAS PRESUMED, AND THE GOVERNMENT FAILED TO REBUT THAT PRESUMPTION BY SHOWING THAT THE EXPOSURE WAS HARMLESS

It is undisputed that the jury here was exposed to extraneous information in the form of forfeiture allegations in an unredacted indictment. Such exposure subverted Mr. Sigmon's fundamental constitutional guarantee to a trial by impartial jury, and warrants a new trial. In denying his motion for a new trial, the court misapplied the law, thus abusing its discretion. Reversal is required.

The Sixth Amendment guarantees the right to trial by an impartial jury. U.S. Const. amend. VI. The Supreme Court has interpreted this to mean a "jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they

happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). "The requirement that a jury's verdict must be based upon the evidence developed at trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted). So, at a minimum, "trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 472–73 (internal quotation marks omitted). Otherwise, since such evidence has not been subject to the rules of evidence, "it may confuse the jurors." *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984).

Recognizing the importance of a defendant's right to a trial by an impartial jury, the Supreme Court fashioned a burden-shifting regime, which this Court has since adopted and applied. Once a defendant makes a "colorable showing" that an exposure to extraneous information has occurred, "prejudice to the defendant is presumed and the burden shifts to the government to show that the jurors' consideration of extrinsic evidence was 'was harmless to the defendant.'" *United States v.*

*Siegelman*, 640 F.3d 1159, 1182 (11th Cir. 2011) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

In other words, the Court must presume the defendant was prejudiced by the jury's exposure to extrinsic information, and the burden then shifts to the government to rebut that presumption of prejudice by demonstrating the exposure was harmless. This Court, in reviewing whether the jury's exposure to the extrinsic evidence was harmless, considers: "(1) the nature of the extrinsic evidence; (2) the manner in which it reached the jury; (3) the factual findings in the district court and the manner of the court's inquiry into the juror issues; and, (4) the strength of the government's case." *Id.* If the government fails to rebut the presumption of prejudice to the defendant, a new trial is "*required*." *United States v. Dortch*, 696 F.3d 1104, 1110 (11th Cir. 2012), *overruled in part on other grounds by Alleyne v. United States*, 570 U.S. 99 (2013) (emphasis added).

Here, the district court failed to hold the government to its burden of rebutting the presumption of prejudice to Mr. Sigmon. Instead of acknowledging the presumption of prejudice and then considering whether the government had rebutted such prejudice by showing that

any exposure was harmless, the court essentially disregarded the presumption altogether and determined in the first instance that Mr. Sigmon "was not prejudiced by the jurors' exposure to the forfeiture allegations." (DE 124:22.) But prejudice was presumed by the mere fact of the jurors' exposure to extraneous information, and the government bore the "heavy burden" of rebutting said presumption, which it failed to do. *United States v. Martinez*, 14 F.3d 543, 550 (11th Cir. 1994).

Mr. Sigmon met his burden of making a "colorable" showing that the jury was exposed to extrinsic information, which is supported by the evidentiary hearing held by the district court, wherein 7 of the 11 jurors questioned confirmed having received and read the unredacted forfeiture allegations. (DE 156:11–24.) Prejudice to Mr. Sigmon is therefore presumed.

The government failed in its obligation to rebut that presumption. Neither the manner in which the extrinsic information reached the jury nor the district court's factual findings and manner of inquiry into the juror issue are of any help to the government in its quest to demonstrate harmlessness. The extrinsic information reached the jury through inadvertence—the jury was only ever supposed to receive a redacted copy

of the indictment along with the evidence in the case but instead received an unredacted copy. The district court only learned of this after the jury had already rendered its verdict. Then, after alerting the parties and holding an initial hearing, the court held an evidentiary hearing wherein it asked only one question of each juror: "During the jury deliberations, do you recall reading or having read to you the entirety of the indictment, that is pages one through two?" (DE 156:8.) Each juror was asked to answer only that question, with no follow-up. As such, the court's factual findings were limited to whether each juror in fact received and reviewed the entire indictment, inclusive of the forfeiture allegations. Seven of the eleven jurors questioned answered in the affirmative, conclusively demonstrating that the jurors were exposed to extrinsic information.

The nature of the extrinsic evidence is of no aid to the government either, because it only deepened the prejudice to Mr. Sigmon. The jury received a two-page document with one heading that read "INDICTMENT" and a separate heading that read "FORFEITURE ALLEGATIONS." (DE 70.) The forfeiture allegations are set apart from the indictment's allegations—as though they are a separate, unrelated entity—and consist of brand-new information that was not cumulative of

any evidence that had already been introduced—they reference entirely different statutes. That is contrary to the district court's incorrect assertion that the "forfeiture allegations did not contain any factual allegations that were not introduced at trial." (DE 124:21.)

Even more troubling, was the substance of the forfeiture allegation in 2.a., which declares:

> 2. Upon conviction of a violation of Title 18, United States Code, Section 2244, as alleged in this Indictment, the Defendant *shall* forfeit to the United States, pursuant to Title 18, United States Code, Section 2253(a):
>
> a. Any visual depiction described in Title 18, United States Code, Sections 2251, 2251A, or 2252, or any book, magazine, periodical, film, videotape, or other matter which contains such visual depiction, which was produced, transported, mailed, shipped or received *in violation of* Title 18, United States Code, Chapter 110.

(DE 70:2 (emphasis added).) Though the forfeiture allegation does not use the phrase "child pornography," applying common sense, the jury could only have understood it to be referring to the possession of child pornography, especially when considered with the government's rebuttal closing argument that Mr. Sigmon possessed child pornography but was good at hiding it. (DE 103:41.) That is, the only reasonable conclusion to be drawn from the forfeiture allegation is that Mr. Sigmon was in

possession of a visual depiction "in violation of" the law—child pornography—that he had to forfeit to the government.

The district court, however, erroneously concluded that it was "entirely reasonable" for the jury to believe "that 'any visual depiction described in Title 18, United States Code, Sections 2251, 2251A, or 2252' referred to the evidence admitted during trial"—the photos from Mr. Sigmon's phone and the videos of the alleged incident. (DE 124:22). That is an unreasonable conclusion. The photos admitted at trial came from Mr. Sigmon's phone, which remained in the government's custody. It defies logic to order him to forfeit something the government already possessed. And the videos admitted at trial were never in Mr. Sigmon's possession to begin with; they came from the cellphones of two bystanders as well as the cruise ship's surveillance camera footage.

Even if the jury did not understand the forfeiture allegation to be referring to the possession of child pornography, however, it is indisputable that the jury would have understood them to be referring to another law violated by Mr. Sigmon. That is, regardless of what the jury believed about the enumerated statutes—whether they referred to the possession of child pornography or something else entirely—the jury

knew Mr. Sigmon was in possession of something that violated the law—"in violation of"—and could have influenced them to believe he committed another crime. The jury could have easily inferred propensity or criminal intent from the allegations, using their best guesses to understand the allegations and their meaning. The forfeiture allegation is phrased in a manner that strongly suggests Mr. Sigmon possessed something illegal—be that child pornography or something else entirely. Either way, there is no innocent way to read the forfeiture allegation; any reading is prejudicial.

Whatever way the jury received the forfeiture allegation—as referring to child pornography in Mr. Sigmon's possession or as referring to his possession of something else illegal—the nature of the forfeiture allegation itself was extremely inflammatory. Its phrasing leaves no room for confusion—Mr. Sigmon violated the law in some other way—and the risk of the jury considering this extrinsic information in finding him guilty is a risk the Sixth Amendment cannot countenance.

Finally, the government finds no solace in the strength of its case, which, as discussed in detail above, was exceedingly weak.[2] The evidence in this case consisted of just three videos, taken from different angles, of Mr. Sigmon at dinner with his family aboard a cruise ship. The government acknowledged numerous times throughout trial that, regardless of what any of the witnesses had to say, "[t]he video is the best evidence of what occurred: It is what it is. It speaks for itself . . . . The videos are the crux of this case." (DE 103:9, 11.) Indeed, the videos presented the only factual evidence from which the jury could determine whether the government had met its burden of proof beyond a reasonable doubt as to each element of the alleged offense. And yet, the videos fail to provide anything akin to proof beyond a reasonable doubt of Mr. Sigmon's intent: whether the touching that occurred was done with a specific intent to abuse, humiliate, harass, degrade, or arouse or gratify his sexual desire, as the statute requires.

[2] The district court did not even consider the strength (or lack thereof) of the government's case in conducting its prejudice analysis, which is yet another reason the court's denial of Mr. Sigmon's motion for a new trial was an abuse of discretion.

To make that showing, the government resorted to rank speculation, conjecture, and insinuation to imply that Mr. Sigmon was sexually aroused by children, including his own daughter. At trial, it was noted that no child pornography was ever found on any of Mr. Sigmon's electronic devices, which he freely provided to law enforcement at their request. (*See, e.g.*, DE 100:123; DE 101:14; DE 103:24.) But during its closing argument, the government posited that Mr. Sigmon, as the former number two at the sheriff's office, knew how not to get caught with any child pornography, perhaps by deleting it off his phone before offering it up to be searched. The insinuation was that he was in possession of child pornography and was sexually aroused by children.

Essentially, the government asked the jury to speculate that Mr. Sigmon touched his daughter with the intent to arouse or gratify his sexual desire because there is no other reason he would touch her, and buttressed that argument and hole in its proof with the insinuation that he possessed hidden child pornography that he knew how not to be caught with. Though there was no actual evidence to support this assertion, the unredacted forfeiture allegations lent credence to that argument. It provided the jury with the missing piece of the puzzle—

evidence supportive of the government's statements about Mr. Sigmon's intent. The forfeiture allegation—written in mandatory language—reads as though it is a forgone conclusion that such child sex abuse material was in Mr. Sigmon's possession, and that upon conviction, he "shall forfeit" it. (DE 70.) The nature of the extrinsic evidence alone renders the prejudice manifest. The government's evidence was nonexistent as to intent, and the forfeiture allegation addressed that gaping hole.

The government entirely failed to rebut the presumption of prejudice that attached from the jury's exposure to the forfeiture allegations in the indictment. Because the forfeiture allegations themselves were so inflammatory and the government's evidence so weak, "[t]he likelihood of prejudice on a jury is obvious." *Perkins*, 748 F.2d at 1534. As such, the jury's exposure to extrinsic evidence—the forfeiture allegations in the indictment—prejudiced Mr. Sigmon, requiring a new trial. The district court abused its discretion in finding otherwise, and its decision must be reversed. *See Martinez*, 14 F.3d at 552 (reversing the denial of defendant's motion for a new trial where the "government's evidence was not overwhelming," making it a "reasonable

probability that extrinsic matters influenced the jury's deliberations"); *Perkins*, 748 F.2d at 1534 (reversing the denial of defendant's motion for a new trial where the government's case was circumstantial, and the government failed to rebut the presumption of prejudice that attached from the jury's exposure to extrinsic evidence).

* * *

In *Patterson v. Colorado*, Justice Holmes observed that "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." 205 U.S. 454, 462 (1907). Indeed, this "theory" that the jury's verdict be based solely upon the evidence offered at trial "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner*, 379 U.S. at 472. Here, the jury's exposure to extraneous information shakes the very foundation of our constitutional trial-by-an-impartial-jury system. As such, because the jury's exposure to extrinsic evidence prejudiced Mr. Sigmon, and the government failed to rebut this prejudice, the Court must reverse the denial of Mr. Sigmon's motion for a new trial and remand.

## CONCLUSION

For the foregoing reasons, Mr. Sigmon respectfully requests that this Court reverse his conviction and remand for entry of a judgment of acquittal. Alternatively, the Court should reverse the district court's denial of his motion for a new trial and remand for a new trial.

Respectfully submitted,

HECTOR A. DOPICO
Federal Public Defender

*/s/ Anshu Budhrani*
ANSHU BUDHRANI
Assistant Federal Public Defender
Attorneys for Appellant
150 West Flagler Street, Suite 1700
Miami, Florida 33130
(305) 530-7000

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 7,908 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14-point font.

*/s/ Anshu Budhrani*
Anshu Budhrani

**CERTIFICATE OF SERVICE**

I HEREBY certify that on this 15th day of September 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day via CM/ECF on Daniel Matzkin, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.

*/s/ Anshu Budhrani*
Anshu Budhrani